**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| FOUNDATION MINERALS, LLC | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Case No. _____ |
| BERT MADERA, MONTIE CAROL | § | |
| MADERA, DICK MCCALL, MILDRED | § | |
| MCCALL, PITCHFORK CATTLE | § | |
| COMPANY, LLC, and OZARK | § | |
| ROYALTY COMPANY, LLC, aka and/or | § | |
| dba OZARK ROYALTY CO., LLC | § | |
| Defendants. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**
**FOR SPECIFIC PERFORMANCE**

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES Plaintiff, FOUNDATION MINERALS, LLC, complaining of Defendants, BERT MADERA and MONTIE CAROL MADERA, DICK MCCALL and MILDRED MCCALL, PITCHFORK CATTLE COMPANY, LLC, and OZARK ROYALTY COMPANY, LLC, a/k/a and/or d/b/a OZARK ROYALTY CO., LLC, and for cause of action shows the Court the following:

<u>**PARTIES**</u>

1. Plaintiff, **Foundation Minerals, LLC**, is a Delaware limited liability company registered to do business in the State of New Mexico.

2. Defendants, **Bert Madera** and **Montie Carol Madera**, husband and wife (the "**Maderas**"), are individuals residing in Lincoln County, New Mexico, and service of process may be effected by personal delivery on them at their residence, located at 125 Bellavia Circle, Ruidoso, New Mexico 88345.

3.      Defendants, **Dick McCall** and **Mildred McCall**, husband and wife (the "**McCalls**"), are individuals residing in Harris County, Texas, and service of process may be effected by personal delivery on them at their residence, located at 1434 Hamblen Road, Kingwood, Texas 77339.

4.      Defendant, **Pitchfork Cattle Company, LLC** ("**Pitchfork**"), is a limited liability company conducting business in the State of New Mexico, with its principal place of business in Lincoln County, New Mexico, and service of process may be effected by personal delivery on its Registered Agent, Montie Carol Madera, at 125 Bellavia Circle, Ruidoso, New Mexico 88345.

5.      Defendant, **Ozark Royalty Company, LLC, also known as and/or doing business as Ozark Royalty Co., LLC** (collectively, "**Ozark**"), a nonresident entity conducting business in the State of New Mexico, has failed to appoint or does not maintain a registered agent in New Mexico.  Pursuant to § 38-1-6 and 38-1-6.1 NMSA and Rule 1-004 NMRA, service may be effected upon Ozark by serving the Secretary of State of New Mexico, at New Mexico Capital Annex North, 325 Don Gaspar, Suite 300, Santa Fe, NM 87501.  Service of said Defendant as described above can be effected by certified or registered mail at Defendant's business address upon R. Brian Coker, or any other officer, director, or statutory agent, at 3652 Northwood Drive, Memphis, Tennessee 38111.

### JURISDICTION AND VENUE

6.      This Court has jurisdiction over this lawsuit under 28 U.S.C. § 1332(a)(1), because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000, excluding interest and costs.

7.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2), because the injuries sustained by Plaintiff and a substantial part of the events or omissions giving rise to the claims occurred in this district, and the real property at interest is located in Lea County, New Mexico.

## TEXAS LAW GOVERNS

8.     Per the agreement of the parties in section 14 of the Agreement at issue in this lawsuit, the Agreement "shall be governed by, and construed and interpreted in accordance with the laws of the State of Texas."  Therefore, Texas law shall govern this lawsuit.

## FACTS

9.     This lawsuit arises out of two nearly identical Mineral Estate Purchase Agreements entered into by and between Plaintiff and the Maderas and the McCalls, on June 5, 2017 and September 8, 2017, respectively (both Mineral Estate Purchase Agreements will be referred to herein collectively as the "Agreement").   Under the Agreement, the Maderas and the McCalls (collectively, the "Sellers") agreed to sell and Plaintiff agreed to purchase certain real property consisting of the Sellers' undivided interest in and to all of the oil, gas and other minerals in and under the lands described in "Exhibit A" to the Agreement located in Lea County, New Mexico (the "Mineral Estate").   A true and correct executed copy of the Maderas' Mineral Estate Purchase Agreement and the McCalls' Mineral Estate Purchase Agreement are attached hereto as **Exhibit 1** and **Exhibit 2**, respectively, and both are incorporated by reference herein for all purposes.

10.     The Sellers, at the time of entering into each respective Agreement, were the owners in fee of the real property in question, *i.e.* the Mineral Estate, and had the ability to perform under the Agreement and to convey title to the Mineral Estate to Plaintiff.

11.     Per the Agreement, Plaintiff agreed to pay the Sellers $15,535.19 per Net Royalty Acre (as defined in the Agreement) owned by the Sellers in the lands covered by the Agreement (the "Purchase Price").  The Agreement also clearly sets forth that the "final amount of the net royalty acres and thus the total purchase price shall be determined by title examination."   At the time of entering into the Agreement with the Maderas on June 5, 2017, based upon the Maderas' representations, Plaintiff believed the Maderas owned 257.48 Net Royalty Acres, which would result in a total Purchase Price of $4,000,000.00.

12.     Per the requirements under the Agreement, Plaintiff placed an earnest money deposit of $50,000.00 with Roswell Escrow Services after each of the Sellers executed their respective Agreement, and the Sellers also executed escrow agreements.

13.     Following execution of the Agreement, Plaintiff began the task of performing due diligence to confirm the Sellers' ownership of the represented 257.48 Net Royalty Acres, and in particular, Plaintiff sought to determine if title to the Mineral Estate was subject to any encumbrances, defects, or other issues which would render title to all or a portion of the Mineral Estate defective or unacceptable.

14.     Per Section 7(a) of the Agreement, if Plaintiff determined that encumbrances, defects, or issues exist which render title to the Mineral Estate

unacceptable to Plaintiff "in its sole discretion", then Plaintiff would promptly advise the Sellers of such encumbrance, defect, or issue and request that the Sellers remove or correct the same.  Sellers would then have the opportunity to cure any title defects or issues where ownership was less than originally represented.

15.    To the extent Sellers failed to remove or correct any issue, defect, or encumbrance within sixty days after receiving notice thereof, 7(a) provides Plaintiff the right and option to do one of five things; however, only options (i), (ii), and (v) were applicable here.

16.    Plaintiff hired a law firm to perform the title examination, to determine any defects or issues to title, and to provide its opinion as to the Sellers' actual, verified ownership interest in the Mineral Estate.  Based upon the deed records and other documentation examined, it was determined that the Sellers' title was significantly less than what the Maderas' had originally represented that the Sellers owned.  In particular, the net royalty for numerous interests was determined to be less than the 25% royalty that was represented and upon which the Agreement originally treated all of the various interests.

17.    Plaintiff's first option under 7(a)(i) was to grant reasonable additional time for the Sellers to remove or correct the issues, defects, or encumbrances.  Plaintiff did grant the Sellers reasonable additional time, and Sellers were able to provide some additional documentation and to rectify some of the title defects.  However, there remained significant defects or issues to title that the Sellers were unable to correct with the additional time.

18.     Plaintiff's second option under 7(a)(ii) was to negotiate a reduction in the Purchase Price, and upon acceptance by all parties, proceed with the closing at the reduced purchase price.  Although attempts were made at negotiating a reduction in the Purchase Price, the Sellers ultimately refused to accept the verified Net Royalty Acres and accompanying reduction in the Purchase Price.

19.     Plaintiff's third and only other applicable option was to proceed under 7(a)(v), which provides that where the royalty interest has been decreased by non-participating royalty interests or other royalty burdens (both of which are the case here), then the purchase price paid for such mineral acre shall be proportionately reduced in accordance with the reduced royalty interest received.  Section 7(a)(v) further provides that adjustments will only be made if the Net Royalty Acres increase or decrease based on title examination, which shall include confirmation of the "assumed 25% lease royalty on all leases".  After failing in its attempts to proceed under the above two options, Plaintiff attempted to proceed with closing this transaction based upon this contractually agreed right and option to proportionately reduce the Net Royalty Acres and the Purchase Price, pursuant to the uncured or unresolved issues, defects, or burdens discovered during title examination, which specifically included the failure of the originally "assumed 25% lease royalty on all leases".  Once again, the Sellers refused to close the transaction under this option.

20.     Until recently, the parties continued to work together to resolve the issues and defects with title to the Mineral Estate and with the calculation of verified Net Royalty Acres, and accordingly, the parties have continually agreed to push back the closing of the transaction to allow for efforts aimed at curing title issues or defects.

21.     However, in a letter dated October 12, 2017 from R. Brian Coker, the Sellers attempt to "repudiate and revoke any contractual obligation" under the Agreement and claim the Agreement is "now voided".  The letter goes on to state that Mr. Madera had made his position clear that "he would not be closing".  This letter makes very clear that Sellers, at least as of October 12, 2017, have repudiated the Agreement and are refusing to close the transaction and to convey good and marketable title to the Mineral Estate, as required under Section 7(b) of the Agreement.

22.     Upon reviewing the Lea County, New Mexico deed records, it has been discovered that, while Plaintiff was undertaking due diligence and proving up the Sellers' interests in the Mineral Estate, both the Maderas and the McCalls were engaged in a series of fraudulent and deceitful conduct as it pertained to the very interests that the Sellers had already knowingly and voluntarily contracted to sell to Plaintiff.

23.     On June 26, 2017, subsequent to entering into the Agreement, via a quit claim deed and assignment, Mr. Madera conveyed and assigned to Pitchfork all of the same oil, gas and mineral interests which the Maderas had contracted to sell to Plaintiff. Per their own sworn acknowledgments, the Maderas are the managing members of Pitchfork.  Therefore, it cannot be disputed that, prior to receiving the quit claim deed and assignment, Pitchfork had full knowledge and awareness of the fact that the oil, gas and mineral interests assigned to it on June 26, 2017 were subject to the prior claims and rights of Plaintiff, via the Agreement.

24.     In addition, after entering into the Agreement and while Plaintiff was performing its title examination and the Agreement was still valid and enforceable, the

Sellers and Pitchfork went and leased certain of the interests comprising the Mineral Estate to a third-party.  Furthermore, Ozark Royalty actually facilitated these leases that were given during the term of the Agreement, and this is blatantly evident from Ozark Royalty's notation on the filed leases.  As any other party in a transaction such as this would know and expect, especially a broker such as Ozark Royalty, Plaintiff entered into each Agreement contemplating purchasing the Sellers' interests as they existed at the time the Agreement was entered into.  In fact, it is in the Agreement, as well as it is standard and well known in the industry, that Plaintiff was going to be paying more for unleased interests because it would then have the ability to negotiate and enter into leases on its own.

25.    At this point in time, Plaintiff has discovered oil and gas leases on the following dates, which were given by the Sellers and Pitchfork to Legion Petroleum, LLC while the parties were contracted under the Agreement:  June 27, 2017, September 21, 2017, September 23, 2017, and September 27, 2017.  Plaintiff has also discovered an oil and gas lease from Pitchfork to Legion Petroleum, LLC covering interests included in the Mineral Estate, dated May 30, 2017, which was only six days prior to the Maderas executing the Agreement and also prior to Pitchfork receiving the purported quit claim deed and assignment from the Maderas.

26.    Upon further investigation, it appears that the company to which the purported leases were given is a company owned or connected to Sellers' attorney and broker, Mr. Coker and Ozark Realty.  This discovery is extremely troubling as the parties had Agreements in place for the purchase and sale of the interests owned by the Sellers, and there was ongoing back and forth communications and sharing of

information as part of the due diligence process, without any mention by the Sellers that the Maderas had just assigned away their interests and that the Sellers and Ozark Royalty had just leased a portion of the subject acreage.  The Sellers' actions were taken without Plaintiff's knowledge or consent.

27.     Furthermore, there is evidence that during the term of the Agreement, the Sellers, through Ozark Royalty as their representative, have been actively marketing the interests subject to the Agreement in an effort to find a higher bidder, and this is despite the obligations imposed upon Sellers in the Agreement requiring them to sell and convey their interests in the Mineral Estate to Plaintiff, as agreed.  These actions of Defendants subsequent to executing the Agreement are unacceptable, fraudulent, and in breach of the Agreement.

28.     Under Section 11 of the Agreement, if the Sellers fail or refuse to convey the Mineral Estate as required or otherwise breach the terms of the Agreement, then Plaintiff "may proceed with such remedies as are afforded by law or equity for breach of this Agreement, ***including specific performance***".

29.     In addition, Section 5 of the Agreement states that "upon closing, Buyer shall be entitled to receive all proceeds attributable to the Mineral Estate, including without limitation, proceeds of production and funds in suspense…"  The wrongful repudiation and refusal of the Sellers to close this transaction has wrongfully deprived Plaintiff of the proceeds attributable to the Mineral Estate.  All proceeds attributable to the Mineral Estate, as of at least October 12, 2017, rightfully belong to Plaintiff.

30.     As a result of the foregoing actions of Defendants, Plaintiff has been caused to suffer extensive damages and seeks to specifically enforce the Agreement.

## CAUSES OF ACTION

### COUNT 1 – BREACH OF CONTRACT

31.    Plaintiff incorporates by reference the facts set forth above.  In addition to, and without waiving the subsequent causes of action herein, Plaintiff would show that the Sellers committed breach of contract.

32.    Plaintiff and the Sellers executed the valid, binding, and enforceable Agreement to sell and purchase the Mineral Estate.

33.    In good faith and with due diligence, Plaintiff performed its obligations under each Agreement, tendered performance of its contractual obligations and sought to close the transaction, and/or was excused from performance.

34.    The Sellers, however, materially breached the Agreement, depriving Plaintiff of the benefits that could have been reasonably anticipated from the full performance thereof.

35.    The Agreement provided that the final amount of the Net Royalty Acres, and thus the total Purchase Price, would be determined by title examination.  Plaintiff performed said title examination and provided the Sellers with notice of the issues, defects, and encumbrances that were discovered pertaining to the Sellers' ownership of the Mineral Estate and the calculation of the Net Royalty Acres.  The Sellers were also provided an opportunity to cure said issues, defects, and encumbrances.

36.    Unfortunately, the Sellers were unable to cure a number of the title defects or to otherwise substantiate that they actually owned the mineral or royalty interests that the Sellers represented to own when the Agreement was entered into.

37.     Section 7 of the Agreement provides the rights and options available to the parties in this situation, and despite Plaintiff's attempts at pursing the applicable options provided by the Agreement, the Sellers have refused and continue to refuse to close on the sale of the Mineral Estate.

38.     In addition, beginning June 5, 2017 and continuing through the closing of the Agreement, any and all actions or attempted actions by the Sellers to sell, assign, encumber, lease, or otherwise negatively impact or convey away rights pertaining to the Mineral Estate are a breach of the Agreement.

39.     All preconditions to Plaintiff's recovery existed or occurred, or in the alternative, the preconditions to the Agreement were excused or subject to avoidance by Plaintiff as a result of the actions and/or inactions of the Sellers.  Plaintiff was at all relevant times ready, willing, and able to perform.

40.     The breach of the Agreement by the Sellers is the direct and proximate cause of Plaintiff's injuries, which include Plaintiff's expectation, reliance, and restitution interest damages.  The damages suffered by Plaintiff are natural, probable, and foreseeable of such a breach.  Plaintiff is also entitled to the reasonable and necessary attorneys' fees it has incurred in having to bring this lawsuit to enforce the Agreement.

## COUNT 2 – ANTICIPATORY BREACH / REPUDIATION

41.     Plaintiff incorporates by reference the facts and allegations set forth above.  In the alternative to Count 1, and without waiving the foregoing and subsequent causes of action herein, Plaintiff would show that the Sellers have taken actions which clearly establish that they have anticipatorily breached and repudiated the Agreement.

42.     There is a long-recognized doctrine of repudiation as a breach of contract, and repudiation is present here because the Sellers' words and actions evidence a distinct, unequivocal, and absolute refusal to perform according to the terms of the Agreement.  An anticipatory breach of contract has occurred, because the Sellers have clearly stated that they were not going to perform when performance was due.

43.     In the October 12, 2017 letter that Mr. Coker sent to Plaintiff on behalf of Sellers, the Sellers state that they "repudiate and revoke any contractual obligation" under the Agreement and claim the Agreement is "now voided".  The letter goes on to state that Mr. Madera had made his position clear that "he would not be closing".  This letter makes clear that the Sellers, at least as of October 12, 2017, have repudiated and anticipatorily breached the Agreement, and that the Sellers are refusing to close the transaction and convey good and marketable title, as required under the Agreement.

44.     Plaintiff strongly disputes that the Agreement was ever voided, and it is clear that the Sellers have repudiated and anticipatorily breached the Agreement in multiple ways.  Such anticipatory breach and repudiation of the Agreement by the Sellers is the direct and proximate cause of Plaintiff's injuries, which include Plaintiff's expectation, reliance, and restitution interest damages.  The damages suffered by Plaintiff are natural, probable, and foreseeable of such a breach.  Plaintiff is also entitled to the reasonable and necessary attorneys' fees it has incurred in having to bring this lawsuit to enforce the Agreement.

### COUNT 3 – BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

45.     Plaintiff incorporates by reference the facts and allegations set forth above.  In addition to all other counts, and without waiving the foregoing and

subsequent causes of action herein, Plaintiff would show that it has a cause of action against the Sellers for breach of the duty of good faith and fair dealing arising out of the Agreement between the parties.

46.    The Sellers' duty to deal fairly and in good faith was breached as it concerns their refusal to close the transaction and to negotiate the closing in good faith based upon the verified findings of the title examination.  The Sellers have also failed to deal fairly and in good faith as it concerns their conduct subsequent to entering into and during the term of the Agreement.  The Sellers' conduct in attempting to assign their interests into Pitchfork, leasing certain oil and gas interests comprising the Mineral Estate, and in trying to market and sell to a higher bidder the interests comprising the Mineral Estate, are clearly breaches of the duty of good faith and fair dealing.

47.    The Sellers' breaches are the direct and proximate cause of Plaintiff's injuries.  Plaintiff is entitled to close the transaction and obtain a conveyance of the interests it purchased under the Agreement between the parties.

## COUNT 4 – DECLARATORY JUDGMENT

48.    Plaintiff incorporates by reference the facts set forth above.  In the alternative to all other Counts, and without waiving the foregoing and subsequent causes of action herein, Plaintiff seeks a judicial declaration from the Court, pursuant to Chapter 37 of the Texas Civil Practice & Remedies Code.

49.    Section 37.004 states that "A person interested under a … written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute [or] … contract … may have determined any question

of … validity arising under the instrument, statute, ordinance, [or] contract… and obtain a declaration of rights, status, or other legal relations thereunder."

50.    A genuine controversy exists between the parties regarding the rights and obligations of the parties pertaining to the Agreement.  This Court has jurisdiction to now determine and adjudicate the rights and obligations of the parties and the questions and controversies that exist between them.  This Court should, therefore, declare that:

a)  A valid and binding contract, *i.e.* the Agreement, exists between Plaintiff and the Sellers;

b)  Under the Agreement, Plaintiff has the right to proportionately reduce the Net Royalty Acres and the Purchase Price as a result of the uncured or unresolved issues, defects, or burdens discovered during title examination;

c)  Pursuant to 7(a)(v) of the Agreement, because the royalty interest has been decreased by non-participating royalty interests or other royalty burdens, the purchase price paid for such mineral acre shall be proportionately reduced in accordance with the reduced royalty interest actually received;

d)  Pursuant to 7(a)(v) of the Agreement, as to all leases in which the assumed 25% lease royalty cannot be confirmed or is confirmed to be less than 25%, a corresponding reduction shall be made in the Net Royalty Acres;

e)  The Sellers are required to perform the Agreement by closing on the transaction and conveying title to the Mineral Estate, as required under 7(b).

## Count 5 – Common-Law Fraud

51.    Plaintiff incorporates by reference the facts set forth above.  In addition to, and without waiving the foregoing and subsequent causes of action herein, Plaintiff would show that Defendants committed common-law fraud against Plaintiff based upon affirmative representations and fraudulent conduct.

52.     Defendants' representations were material in that they were important and influential in Plaintiff's decision to enter into and execute the binding Agreement, and then ultimately expending significant time and expense in performing due diligence and trying to close the transaction.

53.     Defendants' representations were false in that they consisted of words and other conduct suggesting to Plaintiff that facts were true when in actuality Defendants now assert they were not.   The false statements of fact were untrue, deceptive, and misleading regarding past and present facts.

54.     The representations of Defendants were fraudulent with respect to the oil and gas mineral interests that they represented to own, which was nearly twice the Net Royalty Acres that they actually own. This representation that Defendants each owned 257.48 Net Royalty Acres can be seen in the figures that were put into Exhibit "A" of the Agreement.  Title examination and review of the pertinent lease and production records has revealed that Defendants do not in fact own what they falsely represented to own. Upset that they were caught in their false statements, Defendants now seek to use their own misrepresentations as a means to avoid the Agreement and to get out of their obligation to sell and convey the Mineral Estate to Plaintiff.  In other words, Defendants first used their misrepresentations to get Plaintiff to enter into the Agreement, and then once the misrepresentations were discovered by Plaintiff, Defendants sought to use their same misrepresentations to get out of the Agreement.

55.     Defendants also engaged in fraudulent conduct subsequent to entering into the Agreement with Plaintiff.  Within three weeks of entering into the Agreement, the Maderas went and conveyed to Pitchfork all of the interests they had just contracted

to sell and convey to Plaintiff.  Defendants also fraudulently went out and entered into oil and gas leases covering certain interests comprising the Mineral Estate already being sold under the Agreement, and Defendants further attempted to market and sell the Mineral Estate being sold under the Agreement to a higher bidder.  This conduct is even more fraudulent because, the oil and gas leases and marketing of the interests that was performed subsequent to the execution of the Agreement was undertaken by the Sellers' broker, representative, and attorney, Mr. Coker and Ozark Royalty, and the oil and gas leases were entered into with a company that is purportedly related to or affiliated with Mr. Coker and Ozark Royalty.

56.    Beginning June 5, 2017 and continuing through the performance of the Agreement, any actions or attempted actions by Defendants to sell, assign, encumber, lease, or otherwise negatively impact or convey away rights pertaining to said Mineral Estate are clearly fraudulent.

57.    Defendants made the false representations knowing they were false and/or made the false representations recklessly, as positive assertions, and without knowledge of their truth.  Defendants also engaged in the fraudulent conduct knowing it was improper and fraudulent as to the Agreement with Plaintiff.

58.    Defendants intended or had reason to expect that Plaintiff would act in reliance on the false representations and fraudulent conduct.

59.    Plaintiff actually and justifiably relied on the representations when it entered into and executed the Agreement, and then undertook to fulfill its obligations under the Agreement.  To the extent Defendants now refuse or seek to avoid their obligations under the Agreement, namely the conveyance to Plaintiff of the Mineral

Estate interests purchased, Plaintiff's reliance upon Defendants' representations and conduct has been to Plaintiff's detriment and injury.

60.     Plaintiff's detrimental reliance upon Defendants' false representations and fraudulent conduct has directly and proximately caused injury to Plaintiff, which resulted in damages including, but not limited to, out of pocket and benefit of the bargain damages.

61.     Plaintiff's injuries resulted from Defendants' actual fraud or malice, which entitles Plaintiff to exemplary damages under Tex. CPRC § 41.003(a).

### COUNT 6 – FRAUDULENT CONCEALMENT & CONSTRUCTIVE FRAUD

62.     Plaintiff incorporates by reference the facts and assertions set forth above. In addition, and/or in the alternative, to all other counts, and without waiving the foregoing and subsequent causes of action herein, Plaintiff would show that Defendants have committed fraudulent concealment and constructive fraud.

63.     Defendants committed fraudulent concealment and constructive fraud against Plaintiff arising out of their fraudulent actions in entering into oil and gas leases and attempting to market and sell the Mineral Estate subsequent to the Agreement, and then failing to fully disclose such activities, the proceeds received, and the parties involved.   The Maderas further committed fraudulent concealment and constructive fraud against Plaintiff arising out of their fraudulent action in assigning to Pitchfork all of their oil, gas, and mineral interests that were already contractually obligated under the Agreement.   Defendants' actions were clearly contrary to their legal duties, and even more so industry custom, and equity implies constructive fraud in such situations, even if one were to somehow believe that Defendants acted in good faith.

64.     Plaintiff has been damaged as a result of Defendants' fraudulent concealment and constructive fraud.   Additionally, Plaintiff's injury resulted from Defendants' fraud and/or malice, which entitles Plaintiff to exemplary damages under Tex. CPRC § 41.003(a).

### COUNT 7 – STATUTORY FRAUD

65.     Plaintiff incorporates by reference the facts and assertions set forth above. In the alternative and in addition to, and without waiving the foregoing and subsequent causes of action herein, Plaintiff would show that Defendants committed statutory fraud by misrepresentation under Texas Business & Commerce Code § 27.01 in that Defendants and Plaintiff were parties to a transaction involving real estate.

66.     During the transaction, Defendants made a false representation of past and existing material facts to Plaintiff.   Defendants represented that they owned the Mineral Estate in the quantities set forth in Exhibit "A" to the Agreement, which means Defendants represented that they owned nearly twice the Net Royalty Acres that they actually own.   This misstatement of fact was "material" in that it was important to Plaintiff in making the decisions to enter into the Agreement and upon what terms it would agree to the purchase.   This was also "material" in that a reasonable person would attach importance to and be induced to act upon the information in determining whether to enter into such a transaction.   The false statements of fact were untrue, deceptive, and misleading.

67.     Defendants made the false representations for the purpose of inducing Plaintiff to enter into the Agreement and trying to get Plaintiff to unknowingly pay two times more than what it should pay for the Mineral Estate.   Defendants both intended

and had reason to expect that Plaintiff would enter into the Agreement in reliance on the misrepresentations.   Plaintiff did in fact detrimentally rely on Defendants' false representations, and Plaintiff's reliance was both actual and justifiable.

68.   Defendants' false representations directly and proximately caused injury to Plaintiff.  Defendants violated Tex. Bus. & Comm. Code § 27.01 with actual awareness of the falsity of their representations, entitling Plaintiff to exemplary damages under section 27.01(c).

### COUNT 8 – TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS

69.   Plaintiff incorporates by reference the allegations and facts set forth above.   In addition to, and without waiving the foregoing and subsequent causes of action herein, Plaintiff would show that it has a cause of action against Ozark Royalty and Pitchfork for tortious interference with an existing contract.

70.   Plaintiff had valid, binding, and enforceable contracts, *i.e.*, the Agreement, with both the Maderas and the McCalls.

71.   Pitchfork was clearly aware of Plaintiff's contract with the Maderas and Plaintiff's interest in the Mineral Estate subject to the Agreement.  Per their own sworn acknowledgments, the Maderas are the managing members of Pitchfork, and they have both signed on behalf of Pitchfork on each of the fraudulent oil and gas leases that were entered into subsequent to the Agreement.  Combine that with the fact that both of the Maderas signed the Agreement at issue, and it is extremely clear that Pitchfork was aware that the interests were contracted to be sold to Plaintiff under the Agreement.

72.   Ozark Royalty was clearly aware of Plaintiff's contracts with the Sellers and Plaintiff's interest in the Mineral Estate subject to the Agreement.  In fact, one of Mr.

Coker's capacities is as the attorney for the Sellers.  Ozark Royalty represents the Sellers as a broker, and Mr. Coker owns Ozark Royalty and has acted in his capacity as Ozark Royalty in this transaction.  In addition, Ozark Royalty, via Mr. Coker, was the representative for the Sellers in negotiating and putting together the oil and gas leases that the Sellers entered into subsequent to entering into the Agreement with Plaintiff, and it is believed that Mr. Coker is in some manner related to or affiliated with the company to whom the leases were given.  Furthermore, upon information and belief, Ozark Royalty was the representative for the Sellers in their attempts to market and sell the Mineral Estate subject to the Agreement subsequent to the Sellers entering into the Agreement with Plaintiff.

73.    Through their actions, Ozark Royalty and Pitchfork have willfully, intentionally, and knowingly interfered with Plaintiff's contracts and business relationship with the Sellers and are the proximate cause of Plaintiff's damages, which include Plaintiff's expectation, reliance, and restitution interest damages.

### COUNT 9 – CIVIL CONSPIRACY

74.    Plaintiff incorporates by reference the allegations and facts set forth above.

75.    The Maderas, the McCalls, Ozark Royalty, and Pitchfork all combined to accomplish the unlawful purpose of committing fraud against Plaintiff subsequent to entering into and during the term of the Agreement with Plaintiff.  The Maderas and the McCalls, in combination with Ozark Royalty and Pitchfork, fraudulently went out and entered into multiple oil and gas leases covering certain interests comprising the Mineral Estate being sold to Plaintiff under the Agreement, and they also attempted to

market and sell the Mineral Estate being sold to Plaintiff to a higher bidder. Furthermore, the Maderas, in combination with Pitchfork, fraudulently went out and conveyed title to the Mineral Estate at issue into Pitchfork's name to defraud Plaintiff and attempt to circumvent the Agreement.  This conduct was purely driven by money and greed.  This conduct is even more fraudulent because, upon information and belief, the oil and gas leases and the marketing of the interests was undertaken by the Sellers' representative, broker, and attorney in the transaction with Plaintiff, Mr. Coker and Ozark Royalty, and furthermore, the oil and gas leases were entered into with a company that is purportedly related to or affiliated with Mr. Coker and Ozark Royalty.

76.     The Maderas, the McCalls, Ozark Royalty, and Pitchfork had a meeting of the mind regarding their fraudulent object and course of action.  All actions taken by any individuals in furtherance of the conspiracy were taken outside any roles they had as corporate agents or representatives, and were taken for their own personal purposes and gain.

77.     At least one member of this conspiracy committed an unlawful, overt act to further his/her/its fraudulent object and course of action.

78.     Plaintiff has been damaged as a result of the above-referenced conspiracy, all in a sum in excess of the minimum jurisdictional limits of this Court. Additionally, Plaintiff's injury resulted from Defendants' fraud and/or malice, which entitles Plaintiff to exemplary damages under Tex. CPRC § 41.003(a).

### EQUITABLE RELIEF

### SPECIFIC PERFORMANCE

79.     Plaintiff incorporates by reference the allegations and facts set forth above.

80.     First and foremost, herein, Plaintiff seeks the equitable remedy of specific performance of the Agreement.

81.     Specific performance is especially appropriate in this matter, because the Agreement involves real property interests.   Under the Agreement, Plaintiff was to receive the oil and gas mineral interests and lands comprising the Mineral Estate.

82.     The Agreement is valid and enforceable, the Agreement's terms are clear enough that the parties know their obligations thereunder, and Plaintiff did not repudiate or materially breach the Agreement.

83.     Plaintiff does not have an adequate remedy at law for damages and would be inadequately compensated by monetary damages.  At all times relevant, Plaintiff was and still is ready, willing, and able to perform under the Agreement and to pay to the Sellers the Purchase Price based upon the verified Net Royalty Acres, as was agreed to.

84.     Plaintiff performed its contractual obligations, tendered performance of those obligations, and/or tender was excused by the Sellers' breach and repudiation of the Agreement.   On multiple occasions, Plaintiff attempted to close the transaction under the Agreement and stood ready and willing to pay the Sellers the contractually agreed upon Purchase Price for the verified Net Royalty Acres.  Plaintiff demanded both orally and in writing that the Sellers complete the sale and conveyance of the Mineral

Estate, which was the performance required of the Sellers under the Agreement. Plaintiff has performed all obligations imposed upon it by the Agreement, except the payment of the Purchase Price, and this is because the Sellers refuse to accept the payment and to close the transaction.   The Sellers' conduct in continuing to refuse to carry out the transaction, combined with the Sellers' words and in particular the October 12, 2017 letter, make it clear that the Sellers have repudiated and breached the Agreement.

85.    All preconditions to Plaintiff's recovery existed or occurred, or in the alternative, the preconditions to the Agreement were excused or are subject to avoidance based upon the Sellers' actions and statements.   The Sellers have repudiated the Agreement, breached the Agreement, or otherwise failed to perform their obligations under the Agreement, even though the Sellers own and have the ability to sell and convey the subject real property and are otherwise able to perform.

86    This case exemplifies a situation where specific performance of the Agreement is proper, and the Sellers should be required to carry out the transaction and convey good and marketable title to the Mineral Estate to Plaintiff, pursuant to the terms of the Agreement.

## CONSTRUCTIVE TRUST

87.    Plaintiff incorporates by reference the allegations and facts set forth above.

88.    In addition, and/or in the alternative, to the monetary damages set forth herein, Plaintiff seeks a constructive trust on certain property of Defendants.

89.    A constructive trust is an equitable remedy that is designed to prevent a person or entity from gaining through fraud or constructive fraud or to prevent unjust

enrichment.  The need for a constructive trust has arisen as a result of Defendants' conduct in regards to the Agreement and the Mineral Estate subject to the Agreement, as well as Defendants' having withheld or made transfers or conveyances of property belonging to Plaintiff or to which Plaintiff is rightfully entitled through fraud.

90.    Defendants have committed fraud against Plaintiff arising out of their fraudulent actions in conveying away the subject interests, entering into oil and gas leases, and attempting to market and sell the Mineral Estate subsequent to entering into the Agreement, and then failing to fully disclose such activities, the proceeds received, and the parties involved.  Defendants' actions were clearly contrary to their legal duties, and even more so industry custom, and equity implies a constructive trust in such situations.

91.    Where legal title to property is obtained by fraud, or in any other unconscientious manner, the property cannot be equitably retained when it really belongs to another, and equity imposes a constructive trust on the property in favor of the one who in good conscience is entitled to it, and who is considered in equity as a beneficial owner.  A constructive trust must be imposed by the Court in favor of Plaintiff and against Defendants to prevent unjust enrichment and to compensate Plaintiff, as the victim of fraud and breach of the Agreement by Defendants.

92.    The imposition of a constructive trust is proper as there is proof of both actual and constructive fraud by Defendants, and Defendants hold the title to certain property wrongfully obtained or withheld from Plaintiff.  Defendants would benefit by the wrong or would be unjustly enriched if they were permitted to keep and not transfer the property to Plaintiff.

## DAMAGES

93.     As a result of the Sellers' refusal to close the transaction to convey the Mineral Estate, Plaintiff has suffered incidental expenses in addition to the Sellers' failure to convey the Mineral Estate.  Plaintiff is entitled to an award for those damages incurred as a result of the Sellers' failure and/or delay in performance under the Agreement, in addition to specific performance.  Plaintiff is entitled to be put in a position as close as possible to the position that it would have occupied if the conveyance had been made when required by the Agreement.  Thus, Plaintiff is entitled to recover all rentals, bonuses, proceeds, and other monies from the Mineral Estate as of at least October 12, 2017, which is the date that the Sellers' unquestionably repudiated and breached the Agreement.

94.     In the alternative to the requested specific performance of the Agreement, Plaintiff is entitled to actual damages for the injuries it has suffered as a result of Defendants' failure and refusal to complete the transaction governed by the Agreement. Plaintiff may recover economic damages in the form of out-of-pocket damages and benefit-of-the-bargain damages, as well as Plaintiff is entitled to the consequential damages which it has suffered.    Further, and in the alternative, Defendants should be forced to give up the benefits they received to the detriment of Plaintiff, because allowing Defendants such benefits is unjust.

95.     In addition, and/or in the alternative, as a proximate result of Defendants' fraudulent actions, Plaintiff incurred the following expenses: costs and legal fees in connection with due diligence and title examination performed, legal fees paid for negotiating and drafting pertinent documents, and for other incidental legal services

related to the transaction and the attempts to close the transaction, all of which sums and charges were reasonable, necessary, and customary for similar services in the community.

<u>**EXEMPLARY DAMAGES**</u>

96.    Plaintiff is entitled to exemplary damages in addition to a decree of specific performance of the Agreement, because the Agreement was repudiated and/or evaded by the Sellers through independent tortious and willful acts.

97.    Plaintiff will further show that the conduct described herein above was fraudulent and malicious, and that the Defendants' false representations, fraudulent conduct, and conspiracy were made with actual awareness of their falsity and fraudulent nature.   As a result, Plaintiff is entitled to recover exemplary damages to deter fraudulent conduct by others in Defendants' situation.

<u>**ATTORNEYS' FEES AND COSTS**</u>

98.    By virtue of Defendants' actions and inactions pursuant to the Agreement, Plaintiff has been required to employ the undersigned attorneys to protect its interests and to specifically enforce the Agreement, and thus, Plaintiff is entitled to the recovery of its attorney's fees.  Prior to the institution of this suit, on multiple occasions, Plaintiff presented its claims to Defendants and demanded performance of the Agreement by Defendants, but Defendants have continued to fail and refuse to perform their obligations.  Therefore, Plaintiff is entitled to its reasonable and necessary attorney's fees and costs under Tex. CPRC § 38.001, *et seq.*  Plaintiff is also entitled to recover reasonable and necessary attorney fees, expert witness fees, cost for copies of depositions, and costs of court under Tex. Bus. & Comm. Code § 27.01(e).

99.     Accordingly, Plaintiff seeks to recover its reasonable and necessary attorney's fees for services rendered through the trial of this cause, as well as its reasonable and necessary attorney's fees in the event of any and all appeals.  In the alternative, an award of reasonable and necessary attorney's fees and costs to Plaintiff would be equitable and just and is therefore authorized under Tex. CPRC § 37.009.

### CONDITIONS PRECEDENT

100.    Plaintiff fulfilled all of its obligations, and all occurrences and conditions precedent to Plaintiff's right to have the Sellers perform the Agreement by completing the sale and conveyance of the Mineral Estate to Plaintiff had occurred or been performed at the time Plaintiff demanded performance of the Sellers as set forth above. In the alternative, Plaintiff will show that any condition it had not performed or that had not taken place was excused, waived, and/or estopped as a result of the actions or omissions of the Sellers.

### JURY DEMAND

101.    Plaintiff hereby requests and demands a trial, by jury, on all issues properly submitted to a jury.

## PRAYER

**WHEREFORE**, Plaintiff respectfully requests that Defendants be cited to appear and answer, and that on final trial, Plaintiff have the following relief:

   i.   A decree requiring the Sellers to specifically perform the Agreement to sell the Mineral Estate in question, including an order for the Sellers to execute and deliver to Plaintiff a sufficient conveyance of the Mineral Estate in question in accordance with the Agreement;

   ii.  In addition to the remedy of specific performance, judgment against the Sellers for incidental damages in an amount within the jurisdictional limits of the Court;

iii.  In the alternative, if the remedy of specific performance is denied, judgment against the Sellers for damages sufficient to fully compensate Plaintiff for all the injuries and damages described herein, both actual, special, and/or equitable, in an amount within the jurisdictional limits of the court;

iv.  The imposition of a constructive trust as set forth herein above;

v.  Judgment against Defendants for exemplary and punitive damages in a sum within the jurisdictional limits of this court;

vi.  Declaratory judgments as requested herein;

vii.  Pre-judgment and post-judgment interest, as provided by law;

viii.  Costs of suit and reasonable and necessary attorney's fees incurred, as well as expert witness fees and costs for copies of depositions in the case of statutory fraud; and

ix.  Such other and further relief, both general and specific, to which Plaintiff may be justly entitled at law or in equity.

Respectfully Submitted,

**HAMM FRENCH, PLLC**
3000 N. Garfield, Suite 205
Midland, Texas 79705
Phone: (432) 375-6060

By: ___*/s/ Jason B. Hamm*___
          JASON B. HAMM
          jason@hammfrench.com
          MATTHEW FRENCH
          matt@hammfrench.com

          ***Attorneys for Plaintiff***

## MINERAL ESTATE PURCHASE AGREEMENT

THIS MINERAL ESTATE PURCHASE AGREEMENT, made this 5 day of June 2017, by and between **Foundation Minerals, LLC**, as party of the first part, hereinafter called "Buyer," and **Bert and Montie Carol Madera**, together referred to as party of the second part, hereinafter called "Seller";

### WITNESSETH

That subject to the terms, provisions and conditions hereinafter set forth and for the considerations hereinafter specified, Seller and Buyer hereby mutually covenant and agree as follows:

1. Sale of Property.   Seller agrees to sell to Buyer and Buyer agrees to buy from Seller of Seller's undivided interest in and to all of the oil, gas and other minerals in and under the lands described in "Exhibit A", attached hereto and made a part hereof by this reference (the "Mineral Estate"), pursuant to the terms and conditions contained herein.

2. Purchase Price.   Buyer agrees to pay Seller for the oil and gas Mineral Estate **$15,535.19 per Net Royalty Acre** (Net Royalty Acre being defined as: The equivalent of 1 Net Mineral Acre being leased at a 1/8th Royalty. For Example: 1 NMA leased at a 1/4th is equal to 2 NRA) owned by Seller in the lands covered by this Agreement (the "Purchase Price"). The final amount of the net royalty acres and thus the total purchase price shall be determined by title examination, and **for the purposes of this Agreement, it is believed that the Seller owns 257.48 Net Royalty Acres for a total Purchase Price of $4,000,000.00**. The Purchase Price shall be payable as follows:

    (a)      As an earnest money deposit, the sum of **Fifty Thousand Dollars and 00/100 ($50,000. 00)** Dollars shall be paid by Buyer to Seller by way of Roswell Escrow Services on the business day following the date Roswell Escrow Services' Escrow Agreement is executed by Seller, and

    (b)      The sum of **$15,535.19 per Net Royalty Acre** less the amount paid in 2 (a) above, to be paid by Buyer to Seller at the closing to be held as set forth in paragraph 6 below.

3. Expenses.   The expenses of this transaction shall be paid as follows:

    (a)      Buyer shall pay the transfer tax or any associated municipal closing fees in connection with the sale of the Mineral Estate; and

    (b)      Buyer shall pay for all costs incurred in connection with obtaining a title examination or title insurance policies on the Mineral Estate and the cost of recording the deed, as well as Purchaser's attorneys' fees.

    (c)      Buyer shall liable for all expenses arising from or relating to, wholly or in part, the ownership in the Mineral Estate after the Closing Date.

**EXHIBIT**

**1**

tabbies®

(d)     Seller shall liable for all expenses arising from or relating to, wholly or in part, the ownership in the Mineral Estate prior to the Closing Date.

4. <u>Ad Valorem Taxes</u>:   The ad valorem taxes for the Mineral Estate for the current year shall be pro-rated between Buyer and Seller based upon the effective date of this transaction.  The amount shall be based upon such taxes assessed against the Mineral Estate for the preceding calendar year.  In other words, ad valorem taxes will be prorated as of the effective date of this transaction.

5. <u>Revenues</u>:  Notwithstanding anything contained herein to the contrary, upon closing, Buyer shall be entitled to receive all proceeds attributable to the Mineral Estate, including without limitation, proceeds of production and funds in suspense, together with the right to make or enforce any claim(s), for monies or otherwise, pertaining to the Mineral Estate.

6. <u>Closing</u>.   The closing will be held on or before **20-business days after execution of this Agreement**, ("Closing Date"), or on such other date as may be agreeable to the parties hereto.

7. <u>Title</u>.

(a)     <u>Objections to Title</u>.   In the event Buyer determines title to the Mineral Estate is subject to any encumbrance, defect or issue which renders title to the Mineral Estate unacceptable to Buyer in its sole discretion, then Buyer shall promptly advise Seller of such encumbrance, defect or issue and request that Seller remove or correct the same. In the event Seller fails to remove or correct such issue, defect or encumbrance within sixty (60) days after notice thereof, Buyer shall have the right and option to:

(i)     Grant a reasonable additional time for Seller to remove or correct such issue, defect or encumbrance;

(ii)     Negotiate a reduction in the Purchase Price, and upon acceptance by all parties, proceed with the Closing at the reduced purchase price.

(iii)     Waive in writing such title issue, encumbrance or defect or any portion thereof; or,

(iv)     Refuse to accept title to the Mineral Estate, cancel this Agreement in writing, and obtain a refund of the deposit paid to Seller pursuant to paragraph 2(a) of this Agreement.

(v)     <u>With specific respect to Mineral Interests ONLY (specifically excepting Non-Participating Royalty Interests) is expressly understood between the parties that Buyers are intending to acquire all of the royalty interest in each of the mineral acres so acquired.  In the event the royalty interest has been decreased by any non-participating royalty interests or other royalty burdens, then the purchase price paid for such mineral acre shall be proportionately reduced in accordance with the reduced royalty interest received.  As an example, if the royalties received under a mineral acre is 25% less because of prior royalty conveyances or reservations, then the price paid for such mineral acre shall be reduced by 25%.  With specific respect to Seller's Non-Participating Royalty Interests, adjustments will only be made if the Net Royalty</u>

<u>Acres increase or decrease based on title examination which shall include confirmation of the assumed 25% lease royalty on all leases.</u>

(b)     <u>Transfer of Title.</u>   At the closing held pursuant to this Agreement, Seller shall convey the Mineral Estate to Buyer by delivering to Buyer a mutually agreeable proper deed conveying good and marketable title to the Mineral Estate, with covenants of special warranty, free and clear of all liens, mortgages, and encumbrances.

(c)     <u>Open Mortgages.</u>   Should the oil and gas mineral estate be subject to a mortgage, Seller agrees to one of the following in order to ensure the oil and gas mineral estate conveyed to Buyer is delivered free and clear of said mortgage:

     (i)     Buyer shall have the right to have the portion of the Purchase Price that is necessary to pay off any existing mortgages paid directly to the bank, for the credit of Seller.

     (ii)   Have a partial release available at Closing, which releases the oil and gas mineral estate that is being acquired from the mortgage.

8.     <u>Warranties and Representations of Seller.</u>   Seller warrants and represents that:

    ~~(a)   The minerals being acquired are not subject to any existing oil and gas lease~~

    (b)   There is no pending or threatened, litigation, condemnation or similar proceeding or assessment affecting the Mineral Estate, or any part thereof, nor to the best knowledge and belief of Seller is any such proceeding or assessment contemplated or threatened by any governmental authority.

9.     <u>Mineral Classified Lands.</u>   To the extent any of the lands covered herein are mineral classified lands in the State of Texas (also known as Texas Relinquishment Act Lands), then any such conveyance covering such lands shall also include the surface estate.

10.     <u>Brokerage Fees.</u>   Neither Seller nor Buyer have utilized the services of a broker or agent in connection with this transaction and each party agrees to indemnify the other party for any claims by brokers or agents in connection with this transaction.

11.     <u>Default.</u>   If Seller fails or refuses to convey the Mineral Estate as required or otherwise breaches the terms of this Agreement, then the deposit paid by Buyer to Seller pursuant to paragraph 1(a) of this Agreement shall be promptly refunded to Buyer, and Buyer may proceed with such remedies as are afforded by law or equity for breach of this Agreement, including specific performance.   If Buyer breaches the terms of this Agreement, the deposit made by Buyer pursuant to paragraph 2(a) of this Agreement shall be retained by Seller as liquidated damages and as Seller's sole remedy for breach of this Agreement.

12.     <u>Binding Effect.</u>   This Agreement shall extend to and be binding upon the heirs, personal representatives, successors, and assigns of the respective parties hereto.

10620/P&SAGREEMENT/FOUNDATION

13.     Notices.  Any notice to be given by either party hereto shall be in writing and shall be deemed to have been duly given when delivered in person or by registered or certified mailed to the other party at the following address:

    (a)   To Seller:     Mr. Brian Coker, Attorney for Seller
                            3652 Northwood Drive
                            Memphis, TN 38111

    (b)   To Buyer:     Foundation Minerals, LLC
                            c/o Will Crump
                            PO Box 50820
                            Midland, TX 79710

or to such other person and address as may hereafter be specified by written notice by either party to the other.

14.     Governing Law; Severability.   This Agreement shall be governed by, and construed and interpreted in accordance with the laws of the State of Texas. In the event that any provision of this Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, the remainder of this Agreement shall not be affected hereby.

15.     Acceptance by Seller.  This Agreement shall become a binding and enforceable contract between Seller and Buyer upon acceptance and execution of this Agreement by Seller.

16.     Further Assurances.  Seller and Buyer shall execute, acknowledge and deliver or cause to be executed, acknowledged and delivered such instruments and take such other action as may be necessary or advisable to carry out their obligations under this Agreement and under any Exhibit, document, certificate or other instrument delivered pursuant hereto.

17.     Counterparts.  This Agreement may be executed in multiple counterparts; each, when taken together, shall constitute but one agreement.

Offer Expiration.  **This Oil and Gas Mineral Estate Purchase Agreement must be signed by Seller and returned to Buyer via email by June 5th, 2017 at 9:00 AM CT or this offer will become null and void with no further obligation from either party.**

Board Approval.       **This Agreement is subject to Foundation Minerals, LLC's final board approval to be determined no later than three (3) business days following Seller's execution of this agreement.  The 20-business days described in Paragraph 6 shall not begin until such board approval is obtained.**

      IN WITNESS WHEREOF, Buyer has caused this Agreement to be signed as of the day and year first above written.

10620/P&SAGREEMENT/FOUNDATION

BUYER: Foundation Minerals, LLC

By: _____
Will Crump, President


Seller hereby ACCEPTS and AGREES TO the terms, covenants and provisions contained in the foregoing Agreement as of the day and year first above written.

SELLER:

Bert Madera

By: _____

Montie Carol Madera

By: _____

## EXHIBIT "A"

All of Grantor's undivided interest in and to all of the oil, gas, sulphur, and all the other minerals whether similar or dissimilar, including but not limited to oil royalty, gas royalty, overriding royalty, working interest, and royalty in casinghead gas, gasoline, and royalty in any other mineral, on, in and under and that may be produced from lands situated in, including but not limited to, the State of New Mexico, County of Lea, to wit:

| Section | Twp-Rge | Legal | Gross | NMA | NRA |
|---|---|---|---|---|---|
| 8 | 24S-34E | SE/4SE/4 | 40.00 | 2.00 | 4.00 |
| 10 | 24S-34E | E/2 | 320.00 | 0.80 | 1.60 |
| 10 | 24S-34E | W/2 | 320.00 | 0.20 | 0.40 |
| 11 | 24S-34E | W/2E/2, E/2W/2 | 320.00 | 8.00 | 16.00 |
| 25 | 24S-34E | W/2SE/4, E/2SW/4 | 160.00 | 4.00 | 8.00 |
| 26 | 24S-34E | SW/4SE/4 | 40.00 | 4.00 | 8.00 |
| 26 | 24S-34E | NW/4NE/4 | 40.00 | 4.00 | 8.00 |
| 17 | 24S-35E | SW/4 | 160.00 | 3.00 | 6.00 |
| 18 | 24S-35E | SE/4 | 160.00 | 4.00 | 8.00 |
| 19 | 24S-35E | SE/4 | 160.00 | 4.00 | 8.00 |
| 29 | 24S-35E | E/2 | 320.00 | 8.00 | 16.00 |
| 30 | 24S-35E | Lots 3, 4, E/2SW/4, E/2 | 480.58 | 12.01 | 24.03 |
| 31 | 24S-35E | Lots 3, NE/4SW/4 | 80.36 | 1.00 | 2.01 |
| 31 | 24S-35E | SE/4SW/4 | 40.00 | 1.60 | 3.20 |
| 1 | 25S-34E | Lot 1, S/2NE/4, NE/4SE/4, S/2NW/4, E/2SW/4 | 320.01 | 12.80 | 25.60 |
| 3 | 25S-34E | S/2 | 320.00 | 2.00 | 4.00 |
| 5 | 25S-35E | Lots 2, 4, SE/4NE/4, SW/4NW/4, N/2SW/4, NW/4SE/4 | 281.16 | 11.25 | 22.49 |
| 6 | 25S-35E | Lot 3, SE/4NW/4 | 80.15 | 1.38 | 2.76 |
| 6 | 25S-35E | Lot 6, NE/4SW/4, N/2SE/4 | 159.94 | 6.40 | 12.80 |
| 8 | 25S-35E | N/2 | 320.00 | 12.80 | 25.60 |
| 9 | 25S-35E | N/2 | 320.00 | 8.00 | 16.00 |
| 17 | 25S-35E | NE/4, S/2NW/4 | 240.00 | 4.13 | 8.25 |
| 18 | 25S-35E | S/2NE/4 | 80.00 | 1.38 | 2.75 |
| 18 | 25S-35E | S/2NE/4 | 80.00 | 6.00 | 12.00 |
| 20 | 25S-35E | W/2SW/4 | 80.00 | 6.00 | 12.00 |
|  |  |  | 4,922.20 | 128.74 | 257.48 |

## MINERAL ESTATE PURCHASE AGREEMENT

THIS MINERAL ESTATE PURCHASE AGREEMENT, made this 6 day of ~~May~~ SEPT 2017, by and between **Foundation Minerals, LLC**, as party of the first part, hereinafter called "Buyer," and **Mildred McCall and Dick McCall,** together referred to as party of the second part, hereinafter called "Seller":

### WITNESSETH

That subject to the terms, provisions and conditions hereinafter set forth and for the considerations hereinafter specified, Seller and Buyer hereby mutually covenant and agree as follows:

1. Sale of Property. Seller agrees to sell to Buyer and Buyer agrees to buy from Seller of Seller's undivided interest in and to all of the oil, gas and other minerals in and under the lands described in "Exhibit A", attached hereto and made a part hereof by this reference (the "Mineral Estate"), pursuant to the terms and conditions contained herein.

2. Purchase Price. Buyer agrees to pay Seller for the oil and gas Mineral Estate **$15,535.19 per Net Royalty Acre** (Net Royalty Acre being defined as: The equivalent of 1 Net Mineral Acre being leased at a 1/8th Royalty. For Example: 1 NMA leased at a 1/4th is equal to 2 NRA) owned by Seller in the lands covered by this Agreement (the "Purchase Price"). The final amount of the net royalty acres and thus the total purchase price, shall be determined by title examination. The Purchase Price shall be payable as follows:

   (a)   As an earnest money deposit, the sum of Fifty Thousand Dollars and 00/100 ($50,000. 00) Dollars shall be paid by Buyer to Seller by way of Roswell Escrow Services on the business day following the date Roswell Escrow Services' Escrow Agreement is executed by Seller, and

   (b)   The sum of **$15,535.19 per Net Royalty Acre** less the amount paid in 2 (a) above, to be paid by Buyer to Seller at the closing to be held as set forth in paragraph 6 below.

3. Expenses. The expenses of this transaction shall be paid as follows:

   (a)   Buyer shall pay the transfer tax or any associated municipal closing fees in connection with the sale of the Mineral Estate; and

   (b)   Buyer shall pay for all costs incurred in connection with obtaining a title examination or title insurance policies on the Mineral Estate and the cost of recording the deed, as well as Purchaser's attorneys' fees.

   (c)   Buyer shall liable for all expenses arising from or relating to, wholly or in part, the ownership in the Mineral Estate after the Closing Date.



EXHIBIT
2

(d)     Seller shall liable for all expenses arising from or relating to, wholly or in part, the ownership in the Mineral Estate prior to the Closing Date.

4. Ad Valorem Taxes: The ad valorem taxes for the Mineral Estate for the current year shall be pro-rated between Buyer and Seller based upon the effective date of this transaction. The amount shall be based upon such taxes assessed against the Mineral Estate for the preceding calendar year. In other words, ad valorem taxes will be prorated as of the effective date of this transaction.

5. Revenues: Notwithstanding anything contained herein to the contrary, upon closing, Buyer shall be entitled to receive all proceeds attributable to the Mineral Estate, including without limitation, proceeds of production and funds in suspense, together with the right to make or enforce any claim(s), for monies or otherwise, pertaining to the Mineral Estate.

6. Closing. The closing will be held on or before **21-calendar days after execution of this Agreement.** ("Closing Date"), or on such other date as may be agreeable to the parties hereto.

7. Title.

(a)     Objections to Title. In the event Buyer determines title to the Mineral Estate is subject to any encumbrance, defect or issue which renders title to the Mineral Estate unacceptable to Buyer in its sole discretion, then Buyer shall promptly advise Seller of such encumbrance, defect or issue and request that Seller remove or correct the same. In the event Seller fails to remove or correct such issue, defect or encumbrance within sixty (60) days after notice thereof, Buyer shall have the right and option to:

(i)     Grant a reasonable additional time for Seller to remove or correct such issue, defect or encumbrance;

(ii)     Negotiate a reduction in the Purchase Price, and upon acceptance by all parties, proceed with the Closing at the reduced purchase price.

(iii)     Waive in writing such title issue, encumbrance or defect or any portion thereof; or,

(iv)     Refuse to accept title to the Mineral Estate, cancel this Agreement in writing, and obtain a refund of the deposit paid to Seller pursuant to paragraph 2(a) of this Agreement.

(v)     With specific respect to Mineral Interests ONLY (specifically excepting Non-Participating Royalty Interests) it is expressly understood between the parties that Buyers are intending to acquire all of the royalty interest in each of the mineral acres so acquired. In the event the royalty interest has been decreased by any nonparticipating royalty interests or other royalty burdens, then the purchase price paid for such mineral acre shall be proportionately reduced in accordance with the reduced royalty interest received. As an example, if the royalties received under a mineral acre is 25% less because of prior royalty conveyances or reservations, then the price paid for such mineral acre shall be reduced by 25%. With specific respect to Seller's

Non-Participating Royalty Interests, adjustments will only be made if the Net Royalty Acres increase or decrease based on title examination which shall include confirmation of the assumed 25% lease royalty on all leases.

(b)     Transfer of Title. At the closing held pursuant to this Agreement, Seller shall convey the Mineral Estate to Buyer by delivering to Buyer a mutually agreeable proper deed conveying good and marketable title to the Mineral Estate, with covenants of general warranty, free and clear of all liens, mortgages, and encumbrances.

(c)     Open Mortgages. Should the oil and gas mineral estate be subject to a mortgage, Seller agrees to one of the following in order to ensure the oil and gas mineral estate conveyed to Buyer is delivered free and clear of said mortgage:

(i)     Buyer shall have the right to have the portion of the Purchase Price that is necessary to pay off any existing mortgages paid directly to the bank, for the credit of Seller.

(ii)   Have a partial release available at Closing, which releases the oil and gas mineral estate that is being acquired from the mortgage.

8.    Warranties and Representations of Seller. Seller warrants and represents that:

(a)    The minerals being acquired are not subject to any existing oil and gas lease

(b)    There is no pending or threatened, litigation, condemnation or similar proceeding or assessment affecting the Mineral Estate, or any part thereof, nor to the best knowledge and belief of Seller is any such proceeding or assessment contemplated or threatened by any governmental authority.

9.    Mineral Classified Lands. To the extent any of the lands covered herein are mineral classified lands in the State of Texas (also known as Texas Relinquishment Act Lands), then any such conveyance covering such lands shall also include the surface estate.

10.    Brokerage Fees. Neither Seller nor Buyer have utilized the services of a broker or agent in connection with this transaction and each party agrees to indemnify the other party for any claims by brokers or agents in connection with this transaction.

11.    Default. If Seller fails or refuses to convey the Mineral Estate as required or otherwise breaches the terms of this Agreement, then the deposit paid by Buyer to Seller pursuant to paragraph 1(a) of this Agreement shall be promptly refunded to Buyer, and Buyer may proceed with such remedies as are afforded by law or equity for breach of this Agreement, including specific performance. If Buyer breaches the terms of this Agreement, the deposit made by Buyer pursuant to paragraph 2(a) of this Agreement shall be retained by Seller as liquidated damages and as Seller's sole remedy for breach of this Agreement.

3

12.    Binding Effect. This Agreement shall extend to and be binding upon the heirs, personal representatives, successors, and assigns of the respective parties hereto.

13.    Notices. Any notice to be given by either party hereto shall be in writing and shall be deemed to have been duly given when delivered in person or by registered or certified mailed to the other party at the following address:

(a)  To Seller:    Mr. Brian Coker, Attorney for Seller
3652 Northwood Drive
Memphis, TN 38111

(b)  To Buyer:    Foundation Minerals,
LLC c/o Will Crump
PO Box 50820
Midland, TX 79710

or to such other person and address as may hereafter be specified by written notice by either party to the other.

14.    Governing Law; Severability. This Agreement shall be governed by, and construed and interpreted in accordance with the laws of the State of Texas. In the event that any provision of this Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, the remainder of this Agreement shall not be affected hereby.

15.    Acceptance by Seller. This Agreement shall become a binding and enforceable contract between Seller and Buyer upon acceptance and execution of this Agreement by Seller.

16.    Further Assurances. Seller and Buyer shall execute, acknowledge and deliver or cause to be executed, acknowledged and delivered such instruments and take such other action as may be necessary or advisable to carry out their obligations under this Agreement and under any Exhibit, document, certificate or other instrument delivered pursuant hereto.

17.    Counterparts. This Agreement may be executed in multiple counterparts; each, when taken together, shall constitute but one agreement.

18.    Offer Expiration. This Oil and Gas Mineral Estate Purchase Agreement must be signed and postmarked by **September 8th, 2017** or this offer will become null and void with no further obligation from either party.

19.    Board Approval.    This Agreement is subject to Foundation Minerals, LLC's final board approval to be determined no later than seventy-two (72) hours following Seller's execution of this agreement.

IN WITNESS WHEREOF, Buyer has caused this Agreement to be signed as of the day and year first above written.

BUYER: Foundation Minerals, LLC

By: _____
Will Crump, President

Seller hereby ACCEPTS and AGREES TO the terms, covenants and provisions contained in the foregoing Agreement as of the day and year first above written.

SELLER: Mildred McCall

By: _Mildred M. Call_

SELLER: Dick McCall

By: _Dick McCall_

5

# EXHIBIT "A"

All of Grantor's undivided interest in and to all of the oil, gas, sulphur, and all the other minerals whether similar or dissimilar, including but not limited to oil royalty, gas royalty, overriding royalty, working interest, and royalty in casinghead gas, gasoline, and royalty in any other mineral, on, in and under and that may be produced from lands situated in, including but not limited to, the State of New Mexico, County of Lea, to wit:

| Section | Twp-Rge | Legal | Gross |
|---------|---------|-------|-------|
| 8 | 24S-34E | SE/4SE/4 | 40.00 |
| 10 | 24S-34E | E/2 | 320.00 |
| 10 | 24S-34E | W/2 | 320.00 |
| 11 | 24S-34E | W/2E/2, E/2W/2 | 320.00 |
| 25 | 24S-34E | W/2SE/4, E/2SW/4 | 160.00 |
| 26 | 24S-34E | SW/4SE/4 | 40.00 |
| 26 | 24S-34E | NW/4NE/4 | 40.00 |
| 17 | 24S-35E | SW/4 | 160.00 |
| 18 | 24S-35E | SE/4 | 160.00 |
| 19 | 24S-35E | SE/4 | 160.00 |
| 29 | 24S-35E | E/2 | 320.00 |
| 30 | 24S-35E | Lots 3, 4, E/2SW/4, E/2 | 480.58 |
| 31 | 24S-35E | Lots 3, NE/4SW/4 | 80.36 |
| 31 | 24S-35E | SE/4SW/4 | 40.00 |
| 1 | 25S-34E | Lot 1, S/2NE/4, NE/4SE/4, S/2NW/4, E/2SW/4 | 320.01 |
| 3 | 25S-34E | S/2 | 320.00 |
| 5 | 25S-35E | Lots 2, 4, SE/4NE/4, SW/4NW/4, N/2SW/4, NW/4SE/4 | 281.16 |
| 6 | 25S-35E | Lot 3, SE/4NW/4 | 80.15 |
| 6 | 25S-35E | Lot 6, NE/4SW/4, N/2SE/4 | 159.94 |
| 8 | 25S-35E | N/2 | 320.00 |
| 9 | 25S-35E | N/2 | 320.00 |
| 17 | 25S-35E | NE/4, S/2NW/4 | 240.00 |
| 18 | 25S-35E | S/2NE/4 | 80.00 |
| 18 | 25S-35E | S/2NE/4 | 80.00 |
| 20 | 25S-35E | W/2SW/4 | 80.00 |